IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

SCOTT L. KEPPLER,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C12-0022

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . 2

III.  PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . 3

IV.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.    *Keppler's Education and Employment Background* . . . . . . . . . . . 5
     B.    *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . 5
         1.    *Keppler's Testimony* . . . . . . . . . . . . . . . . . . . . . 5
         2.    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . 6

V.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . 11
     A.    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . 11
     B.    *Objection Raised By Claimant* . . . . . . . . . . . . . . . . . . . 12

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Scott L. Keppler on February 14, 2012, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Keppler asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits. In the alternative, Keppler requests the Court to remand this matter for further proceedings.

# II. PROCEDURAL BACKGROUND

On January 26, 2009, Keppler applied for disability insurance benefits. On January 27, 2009, he applied for SSI benefits. In both applications, Keppler alleged an inability to work since September 26, 2006 due to seizures, headaches, blurred vision, back pain, and a torn rotator cuff in his right shoulder. Keppler's applications were denied on June 30, 2009. On October 23, 2009, his applications were denied on reconsideration. On January 5, 2010, Keppler requested an administrative hearing before an Administrative Law Judge ("ALJ"). On March 8, 2011, Keppler appeared via video conference with his attorney before ALJ Julie K. Bruntz for an administrative hearing. Keppler and vocational expert Roger Marquardt testified at the hearing. In a decision dated March 18, 2011, the ALJ denied Keppler's claims. The ALJ determined that Keppler was not disabled and not entitled to disability insurance benefits because he was functionally capable of performing work that exists in significant numbers in the national economy. Keppler appealed the ALJ's decision. On December 20, 2011, the Appeals Council denied Keppler's request for review. Consequently, the ALJ's March 18, 2011 decision was adopted as the Commissioner's final decision.

On February 14, 2012, Keppler filed this action for judicial review. The Commissioner filed an Answer on April 19, 2012. On May 22, 2012, Keppler filed a brief arguing that there is not substantial evidence in the record to support the ALJ's

finding that he is not disabled and that he is functionally capable of performing work that exists in significant numbers in the national economy. On July 18, 2012, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On March 6, 2012, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## *III. PRINCIPLES OF REVIEW*

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence."

*Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also

be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Keppler's Education and Employment Background

Keppler was born in 1968. At the administrative hearing, Keppler testified that he went to school through the tenth grade. Keppler stated that he took special education classes because he had difficulty with reading, writing, and mathematics. He stated "I was just slower."[1]

The record contains a detailed earnings report for Keppler. The report covers the time period of 1986 to 2006. Keppler had minimal earnings in 1986 (less than $700). From 1987 to 1996, he earned between $1,368.00 (1995) and $11,434.79 (1992). He had no earnings in 1996. From 1997 to 1999, Keppler earned between $3,912.79 (1999) and $23,126.41 (1998). He again had no earnings in 2000. From 2001 to 2006, he earned between $13,834.25 (2001) and $24,654.41 (2005). He has no earnings since 2007.

### B. Administrative Hearing Testimony

#### 1. Keppler's Testimony

At the administrative hearing, Keppler's attorney asked Keppler what prevented him from being able to work. Keppler's initial response was "I was having problems with heat stroke."[2] Keppler's attorney further questioned Keppler:

> Q: Were you having seizures then?
> A: Well, I was, but I didn't know that's what it was at the time.
> Q: Okay.
> A: You know, as far as not having the grand mals, but what they call the 'partials.'
> Q: Okay. And [can] you describe what you feel like when you have a partial seizure, if you, as best as you can.

---

[1] Administrative Record at 35.

[2] Administrative Record at 37.

> A: Well, usually, I don't really realize it until it's, you know kind of over with. Just a little confusion. You know, I'll grasp where I'm at but not really why.
> Q: You, okay. Do you lost [sic] time? Have you lost time? Have you been somewhere and said, 'Geez, I don't know what happened for the last half hour'? Anything like that?
> A: Yes.
> Q: Is that what happens?
> A: Yes.
> Q: Yeah. I, and does it take a while to recover once you've had a partial seizure?
> A: Well, as far as pain or soreness, there's none of that. I'm just confused and I kind of have to get my bearings for a few minutes.

(Administrative Record at 37.) Keppler also stated that he takes medication for his seizure disorder. Specifically, Keppler testified that he takes Dilantin, which keeps him from having grand mal seizures, but does not completely control his partial seizures.

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Roger F. Marquardt with a hypothetical for an individual who:

> cannot climb ladders, ropes, or scaffolding. He would need to avoid hazards such as heights and machinery. He is not able to drive. He cannot work with power machines that require another operate, another operator, or operate a motor vehicle.

(Administrative Record at 56-57.) The vocational expert testified that under such limitations, Keppler could not perform his past relevant work. The vocational expert further testified that Keppler could perform the following work: (1) hardware assembler (500 positions in Iowa and 38,000 positions in the nation), (2) woodworking assembler (370 positions in Iowa and 20,000 positions in the nation), and (3) "automobile body repairer helper" (1,000 positions in Iowa and 72,000 positions in the nation). The ALJ also inquired as to the employability of an individual who "would occasionally need more

6

supervision than other workers."[3] The vocational expert testified that under such a limitation Keppler would be precluded from competitive employment. Similarly, Keppler's attorney asked the vocational expert whether all employment would be eliminated if an individual need five unscheduled breaks at arbitrary times during an eight-hour workday. The vocational expert answered that under such a limitation Keppler would be precluded from competitive employment.

### C. Keppler's Medical History

On September 17, 2006, Keppler suffered a full tonic clonic seizure. Dr. Anthony D. Carter, D.O., noted that Keppler had not been taking his prescribed medication, Dilantin. Dr. Carter prescribed Keppra instead of Dilantin as an anti-seizure medication for Keppler. Dr. Carter also restricted Keppler from driving, swimming in pools, taking baths, and working at heights for six months. Lastly, Dr. Carter encouraged Keppler to seek follow-up care at the University of Iowa Hospitals and Clinics ("UIHC").

On December 12, 2006, Keppler met with Dr. Mark A. Granner, M.D., at the UIHC Comprehensive Epilepsy Clinic, for a consultation regarding seizures. Upon examination, Dr. Granner opined that "[g]iven his description of having an ill feeling as well as olfactory hallucinations prior to losing consciousness, he has likely been experiencing partial epilepsy that has secondarily generalized at least 3 times."[4] Dr. Granner recommended that Keppler avoid driving, working with heavy machinery, and climbing ladders by himself. Dr. Granner also recommended that Keppler undergo an EEG and MRI.

On December 28, 2006, Keppler underwent and EEG and MRI. Dr. Granner informed Keppler that the EEG was "abnormal, showing occasional irritable activity in the

---

[3] Administrative Record at 58-59.

[4] Administrative Record at 260.

left temporal area, indicating increased tendency toward seizures."[5] Keppler's MRI brain scan was normal, and no acute intracranial abnormalities were found.

On March 5, 2009, Keppler met with Dr. Maggie Mangold, M.D., regarding his difficulty with seizures. Dr. Mangold noted that Keppler went off Dilantin because he "ran out of money." Dr. Mangold further noted that while on his medication, his seizures were "well controlled" and occurred "rarely." Keppler reported that he believed he was having some seizures at home because he "has periods of time he does not remember and is told at times he 'blanks out' and stares into space."[6] Upon examination, Dr. Mangold diagnosed Keppler with a seizure disorder. Dr. Mangold restarted Keppler on Dilantin as treatment.

On May 4, 2009, Keppler met with Dr. Mangold following a seizure episode. Keppler reported that:

> last Wednesday he had an episode that friends reported to him. [Keppler] remembers going in to lie down in his bed for a few minutes, but after that can't remember anything. Friends reported that he threw a chair out the door, was throwing trophies around the house, threw a plant across the room. He doesn't remember any of it. Never had anything like this before.

(Administrative Record at 321.) Keppler told Dr. Mangold that he had been regularly taking his medication. Upon examination, Dr. Mangold opined that Keppler's seizure disorder was "uncontrolled." Dr. Mangold recommended that Keppler continue his medication as treatment.

On May 7, 2009, Keppler met with Dr. John D. Kuhnlein, D.O., for a consultative examination. Dr. Kuhnlein noted that Keppler's activities of daily living included doing household chores, cooking, cleaning, laundry, and gardening. Keppler also told

---

[5] *Id.* at 262.

[6] *Id.* at 314.

Dr. Kuhnlein that he had difficulties walking and lifting due to problems with his right hip and right shoulder. Upon examination, Dr. Kuhnlein opined that Keppler's physical examination was "essentially unremarkable." Dr. Kuhnlein noted that Keppler's "[m]ovements were easy and nonlabored. Muscle strength is intact and range of motion is within normal limits."[7] Dr. Kuhnlein restricted Keppler from climbing or working on ladders. Dr. Kuhnlein also restricted Keppler from using power tools.

On June 29, 2009, Dr. Gary Cromer, M.D., reviewed Keppler's medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Keppler. Dr. Cromer found no exertional, postural, manipulative, visual, or communicative limitations. Dr. Cromer determined that Keppler should avoid concentrated exposure to hazards such as machinery and heights. Dr. Cromer concluded that:

> Evidence documents a severe medically determinable impairment with [history of] partial seizures with secondary generalization. These have been well controlled and do not meet or equal any reference listings. Credibility is eroded by noncompliance, allegations not well documented in the [medical evidence of record] and essentially normal physical exam at [consultative examination].

(Administrative Record at 345.)

On July 28, 2010, Keppler met with Dr. Scott Strader, M.D., and Dr. Granner for seizure management. Dr. Strader indicated that Keppler had not had a tonic clonic seizure since 2006. However, Dr. Strader noted that "over at least the past 2 years, and probably longer, [Keppler] will have periods where he loses time."[8] Specifically, Dr. Strader noted that:

> [Keppler] will have driven home and not known how he got there, and he will also get lost in his house Additionally, he

---

[7] Administrative Record at 333.

[8] Administrative Record at 361.

9

> may stop in the middle of a conversation and 'go blank' where
> he will stare straight ahead and be unresponsive. . . . It lasts
> anywhere from 15 seconds to one minute. He is not having
> these daily, but the frequency has been increasing, and he
> estimates it may be twice a week.

(Administrative Record at 361.) Incidently, Keppler had a "staring" spell during his examination with Drs. Strader and Granner. According to Dr. Strader, Keppler "stopped mid sentence while seated on the exam table and stared straight ahead without blinking, oral movements or clothes picking. . . . This lasted approximately 10 seconds after which he was unsure quite what had happened."[9] Dr. Strader further noted that "[t]his happened at the beginning of the encounter, and he was able to complete the rest of the history and examination with no difficulty."[10] Both Dr. Strader and Dr. Granner diagnosed Keppler with ongoing episodes of staring straight ahead that are suspicious for complex partial seizures. Dr. Granner recommended increasing Keppler's dosage of Dilantin as treatment, and ordered Keppler to return for follow-up in six months.

On November 19, 2010, at the request of Keppler's attorney, Dr. Granner filled out a "Seizures Residual Functional Capacity Questionnaire." Dr. Granner diagnosed Keppler with epilepsy and partial seizures with secondary generalization. According to Dr. Granner, Keppler's typical seizures last 60 seconds and occur sporadically. Dr. Ganner opined that Keppler's seizures: (1) are likely to disrupt the work of co-workers; and (2) will require more supervision at work than an unimpaired worker. Dr. Granner restricted Keppler from working at heights, working with machinery, and driving. Dr. Granner opined that Keppler would need unscheduled breaks lasting 15-30 minutes during an eight-hour workday. Dr. Granner indicated that the frequency of the unscheduled breaks would depend on the frequency of Keppler's seizures. Lastly, Dr. Ganner found that Keppler could tolerate moderate work stress.

---

[9] *Id.* at 363.

[10] Administrative Record at 363.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Keppler is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id.* The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is

'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Keppler had not engaged in substantial gainful activity since September 26, 2006. At the second step, the ALJ concluded from the medical evidence that Keppler had the following severe impairment: epilepsy. At the third step, the ALJ found that Keppler did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Keppler's RFC as follows:

> [Keppler] has the residual functional capacity to perform medium work . . . except he cannot climb ladders, ropes, or scaffolding and he must avoid hazards such as heights and machinery. Additionally, he is unable to drive a motor vehicle and he cannot work with power machines that require an alert operator.

(Administrative Record at 17.) Also at the fourth step, the ALJ determined that Keppler could not perform any of his past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Keppler could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Keppler was not disabled.

### B. Objection Raised By Claimant

Keppler argues that the ALJ failed to properly develop the record with regard to his seizure disorder. Implicitly, Keppler argues that the ALJ's RFC assessment is not supported by substantial evidence, and the ALJ failed to properly consider the opinions of Dr. Granner. Keppler concludes that:

> The ALJ's decision should be reversed and this matter remanded for further proceeding, including a residual functional capacity assessment that includes the need for absences due to Mr. Keppler's seizures, specifically

> determining the frequency of [Keppler's] seizures and the
> length of the ictal and postictal period and the effect of such
> absences on the occupational base.

Keppler's Brief (docket number 10) at 13. The Commissioner responds that the ALJ properly determined Keppler's RFC and properly weighed the medical opinions and evidence in the record.

An ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

An ALJ also has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Lastly, an ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record."

*Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

14

Here, the ALJ thoroughly reviewed Keppler's medical records and fully considered the opinions of his treating and consultative sources.[11] In particular, with regard to the opinions of Dr. Granner, the ALJ determined that:

> The undersigned acknowledges the residual functional capacity questionnaire submitted by Dr. Granner and the opinions set forth therein. These conclusions, however, do not seem based on any observations of Dr. Granner. For instance, Dr. Granner opines that [Keppler] would be disruptive to coworkers and would need greater supervision in the work place. This is contrary to his observation of one [of Keppler's] partial seizures that he noted lasted only moments. Furthermore, Dr. Granner indicated he was unaware of the frequency of [Keppler's] seizures, and it appears that at least some of his responses were made accounting for grand mal, as opposed to partial seizures. Such opinions are questionable given the record does not show a grand mal seizure in [Keppler's] history since September 2006.

(Administrative Record at 21.) Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Granner. The Court also finds that the ALJ provided "good reasons" both explicitly and implicitly for rejecting Dr. Granner's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

The Court reiterates that the ALJ thoroughly reviewed Keppler's medical records and fully considered the opinions of treating and consultative sources, including the opinions of Dr. Granner.[12] The Court finds such medical evidence adequate for making a disability determination. Having reviewed the entire record, the Court finds that the ALJ properly considered Keppler's medical records, observations of treating physicians, and

---

[11] *See* Administrative Record at 15-21.

[12] *See* Administrative Record at 15-21.

Keppler's own description of his limitations in making his RFC assessment for Keppler.[13] *See Lacroix*, 465 F.3d at 887. Furthermore, the Court finds that the ALJ's decision is based on a fully and fairly developed record, including both Keppler's proper use and noncompliance with medications.[14] Specifically, the ALJ determined:

> After December 2006, when Dr. Granner treated [Keppler] following his most recent grand mal seizure, medical records show a gap of treatment for this condition of more than 27 months, or roughly 50 percent of the period [Keppler] is alleging disability. Furthermore, among his notes at that time, Dr. Granner indicated [Keppler] admitted discontinuing his Dilantin as of 2004. . . . Dr. Mangold's medical records also note lack of compliance with his medication, albeit for alleged financial hardships. The merits of this contention are questionable, however, as Dr. Mangold's records show both procrastination and further noncompliance in subsequent treatment history.
>
> Noting that [Keppler] needed his driver's license reinstated to resume work, and noting that his condition was 'well controlled with only rare seizures' while on the Dilantin, Dr. Mangold recommended [Keppler] reapply for Iowa Care insurance, which would help cover the costs of his prescription while he waited the statutory period for reinstatement. . . .
>
> Not only does this cast doubt on [Keppler's] reason for discontinuing his medications, but also the possible rationale for not abiding by his prescribed dosages. Medical records confirm [Keppler] admitted to stretching a two-month prescription for Dilantin over the course of three-and-a-half months in August 2009, after [Keppler] was encouraged to reapply for assistance. Additionally, testing by Dr. Mangold revealed that [Keppler's] Dilantin levels were still low in his system despite her dosage instructions. She postulated this

---

[13] *See id.*

[14] *See* Administrative Record at 19-20 (providing a thorough discussion of both Keppler's use and noncompliance with medication used to treat his seizures).

> was due to either too low a dose being prescribed, or to the fact that [Keppler] was not taking his medicine as prescribed. Four months later, when [Keppler's] Dilantin levels were tested and found to be adequate, Dr. Mangold had not increased his dosage, which suggests that the reason [Keppler's] levels were previously low was due to his noncompliance.

(Administrative Record at 19-20.) It is clear from the ALJ's decision that she properly addressed, and fully and fairly developed the record with regard to the issue of both Keppler's use and noncompliance with his seizure medication. *See Cox*, 495 F.3d at 618. In conclusion, because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618.

## VI. CONCLUSION

The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Granner, a treating source. The Court also finds that the ALJ fully and fairly developed the record with regard to the medical evidence in the case, and made a proper RFC assessment for Keppler. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 20th day of November, 2012.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA